SMITH, Justice:
John Malcolm Eubanks, Jr. died January 24, 1964, as the result of injuries received when the Volkswagen which he was driving collided with a trailer-truck, being driven by appellant Mid Thomas, Jr. on Mississippi Highway #26, a few miles west of Lucedale.
An action for damages was brought by Eubanks’ wife and children, under the pro *426 visions of Mississippi Code Annotated section 1453 (Supp.1964), sometimes referred to as the “wrongful death” statute, against appellants, Mid Thomas, Jr., the driver, and Aero Mayflower Transit Company, and James E. McConnell, Jr. and James W. McConnell d/b/a McConnell Transfer & Storage, about whose business Thomas was alleged to have been at the time.
This suit was filed originally in the Cir•cuit Court of Jackson County. That court entered an order dismissing as to Aero May'flower Transit Company, and granting a ■change of venue to the other defendants to the Circuit Court of Lowndes County. An ^appeal to this Court was attempted to be taken from this order, and that appeal was ■dismissed as premature, as reported in Eubanks v. Aero Mayflower Transit Co., 253 Miss. 159, 175 So.2d 169 (1965)
The plaintiffs entered a voluntary non-suit in the Lowndes County Circuit Court, and then refiled the same action in the Circuit Court of George County against all defendants, including Aero Mayflower Transit Company. That court likewise dismissed as to Aero Mayflower, and appellees have filed a brief as appellants from the order of dismissal. The case was tried in the Circuit Court of George County, before a jury which returned a verdict for the plaintiffs against the individual defendants in the sum of $35,000. From that judgment appellants have prosecuted this appeal and appellees have cross-appealed.
Aero Mayflower Transit Company has filed a motion to dismiss the appeal of the Eubanks heirs as to it, asserting that the former order of dismissal became final when plaintiffs voluntarily entered the non-suit, that the appeal was not timely, no bond has been filed, and no process has been served upon it. ■
Numerous grounds are assigned for reversal; but, in view of the conclusions reached upon the merits, it is necessary to notice only one. It is contended by appellants that the evidence was insufficient to sustain the verdict of the jury and that the trial court should have sustained their motions to direct the jury to return a verdict in their favor.
The collision occurred about 5 :00 a. m. on January 24, 1964. It was a dark, foggy night and it was raining. The blacktop pavement of the highway was wet, and there was water puddled on the highway and water in the ditches.
The only surviving witness to the accident was appellant, Mid Thomas, Jr., driver of the tractor-trailer with which the Volkswagen collided. The substance of Thomas’, testimony was as follows: He had been driving trucks and trailers for ten years. On the occasion in question, he was proceeding in a westerly direction at a speed of about 30 to 35 miles per hour. He was in the north lane of the two-lane blacktop highway, his vehicle was north of the painted center line, and his lights were on. He saw the Volkswagen approaching from.the opposite direction when it was about 200 yards away. Its lights were on, and it was proceeding easterly and was in the south lane of the highway.
The Volkswagen passed the tractor portion of the tractor-trailer combination, but struck the van-type trailer near its center. Thomas felt the impact, instantly glanced in his rearview mirror and saw that the Volkswagen had struck the side of the van. At the time, he was in his proper lane. He brought his rig to a halt in about 75 feet. He put on his flashing lights and ran back to the Volkswagen, which was partly on the south shoulder and partly on the blacktop pavement. He found Eubanks pinned inside it. He ran to the nearest house, which was only a short distance away, and from there was sent to another nearby house where he asked the man who came to the door to call an ambulance and to notify the highway patrol. He then ran back to the scene, and flagged an approaching log truck, which stopped in the eastbound lane. He and the driver of this vehicle then attempted to get Eubanks out of the Volkswagen, but it was jammed and they were unable to do so. In *427 the meantime, some ten or fifteen cars had passed, a number had stopped, and some fifteen or twenty people were milling about the scene.
After a time, an ambulance arrived. By employing a long iron lever, supplied by the driver of the log truck, and said to be known in logging as a “cheeta,” the door of the Volkswagen was finally forced open, Eu-banks was extricated from inside, and placed in the ambulance. The ambulance backed into a small dirt or gravel road which left the highway on the south, at a point about eight feet in front of the Volkswagen, pulled out, and went back to town. This was a “turn off” road leading to the house of one Morris Scott.
The only other person who testified in the case who had any actual knowledge of the occurrence, although she did not see it happen, was a Mrs. Fuquay who lived about fifty feet off the highway, nearly opposite the place where the collision occurred. She testified that she had heard the impact. Her house was located in the intersection of the highway with the little dirt or gravel road which left the highway at a point about eight feet in front of the spot where the Volkswagen had come to rest.
She said she had been in her bed, which was right by a window, and, upon hearing the impact, she had immediately lifted the vénetian blind and looked out. She did not see the Volkswagen at first, but saw the trailer truck and said that, as she looked, it moved on about fifty or sixty feet and stopped. She said the truck was “just moving down the highway” and that “it wasn’t going too fast.” She also stated, “It was straight in the road, and she could tell because it had its lights on.” She went out and was there when the ambulance came and removed Mr. Eubanks from the Volkswagen. She said the ambulance pulled up the little road and got behind the car with the stretcher to take him out. There were a good many other people there too, who had stopped their cars and were milling around.
The ambulance driver testified that when he arrived, the Volkswagen driver was. “pinned in the car.” He further said:
“I found Eubanks sitting under the' steering wheel of the Volkswagen. His* feet were pinned with the clutch and the-brake pedal. The holes where the glass, was, the windshield and door was in on it, We couldn’t move him. We had to use iron pipe to prise some of the metal off to get his feet out and a couple of colored men and Mr. Morris Scott got ahold of the post of the Volkswagen by the door and pulled it back and we got him out on the driver’s side.” (Emphasis added.)
He parked his ambulance “in the middle of the road, pulled up beside the Volkswagen.” He turned the ambulance around in the little dirt or gravel road just in front of the Volkswagen, by backing the ambulance into it and then pulling out and heading back to town. He had remained parked by the Volkswagen until after he had! gotten Eubanks out and loaded him into the ambulance. The ambulance had come and gone before the highway patrolman arrived,' some fifteen or twenty minutes later. The ambulance driver corroborated Thomas in his testimony that they had used the iron lever to pry open the lefthand door of the Volkswagen on the driver’s side, in order to remove Eubanks.
Neither Thomas, Mrs. Fuquay, nor the ambulance driver were contradicted or impeached in any respect.
There was no direct evidence tending to support the allegation made in the declaration that the collision, and the resulting injury and death of Eubanks, proximately resulted from negligence on the part of Thomas in or about the operation of the tractor-trailer. This charge must be sustained, if at all, by the testimony of the highway patrolman, who arrived fifteen or twenty minutes after Eubanks had been removed from the Volkswagen and the ambulance had come and gone.
*428 The patrolman testified that he had been asleep when he was called in the early morning hours. It was dark, foggy, and drizzling rain. He dressed and drove out to the scene. There he found a Volkswagen, with the upper left front portion heavily damaged, with its windshield and its left head lamp smashed. This vehicle was headed east in the south lane of the highway, which ran generally east and west, and was partly on the pavement and partly off on the shoulder, and was standing about eight feet west of the “turn off” road leading to the residence of one Morris Scott. There was no one in the Volkswagen when he arrived. At this point, he said, the blacktop pavement was twenty-two feet wide.
The truck and trailer were about 60 feet west of the Volkswagen, in the north lane of the highway, heading west, and the left side of the tractor-trailer was from eight inches to one foot north of the painted center line of the highway. Photographs made by the patrolman, and appearing in the record, show that the trailer was a van-type trailer, some fifteen feet in height, with flat perpendicular sheet metal sides or walls, extending out over the wheels, and, between the wheels, down to within a foot or a foot and a half of the surface of the pavement. The trailer itself was quite long, and near its center, and extending about one and a half or two feet up the side of the trailer, there appear marks and an indentation which extended along the side of the trailer for about three feet, revealing that the trailer wall had been struck a rather heavy, hut glancing, blow.
The patrolman arrived at the scene, he thought, about S :30 a. m. It had been raining off and on all night, and rain was still falling. The pavement was quite wet, and there was water in the ditches. He observed some dirt, glass and chrome in the south lane of the highway, within eight to fifteen feet of the Volkswagen. He did not pick up any of this debris on his first visit to the scene at S :30 a. m. Plowever, with one Bailey, he returned at about 7:30 a. m. or 8:00 a. m., and, on this visit, he picked up several bits of glass and chrome, and some paint scrapings, which were introduced in evidence.
By the time the patrolman arrived, the ambulance had carried Eubanks away, and he died without making any statement. The patrolman, not having been there, knew nothing of what had been done by Thomas and the ambulance people in using the lever in prying open the Volkswagen door or in extricating Eubanks, nor how the ambulance had been maneuvered at the'1 scene. In fact, he was not able to say, and made no attempt to say, that any of the things he observed at the scene were in the same condition or were situated as they had been immediately following the accident.
He did say that a wrecker came and removed the Volkswagen while he was there, but he could not remember how this had been done. Neither the driver of the wrecker nor Bailey, who had accompanied the patrolman to the scene on his second visit, testified. The patrolman corroborated Thomas and Mrs. Fuquay in stating that traffic had been reasonably heavy since the accident; that, when he arrived, there were numerous vehicles parked at the scene and a number of people were milling about. He could, not, of course, say how many vehicles had used the highway or the “turn off” road following the accident and before he arrived. It was established, however, that the vehicles had not been moved.
On his return to the scene at about 7:30 a. m. or 8:00 a. m., some two or three hours after the accident, he picked up some bits of glass, pieces of chrome, and paint scrapings. These latter were picked up in the south lane where the Volkswagen was, and some about eight feet from the Volkswagen in the entry to the “turn off” road, all having been within a radius of some eight to fifteen feet of the Volkswagen. He did not find any skid marks.
*429 It may be said to be reasonable to infer that the bits of glass, chrome and paint scrapings came from the wrecked Volkswagen. But it is speculation, under the undisputed circumstances of this case, to say that they had come to rest following the impact where found by the patrolman, particularly since the ambulance and numerous other vehicles and pedestrians had traversed the area.
It would be as logical to suppose that they were dislodged from the wrecked vehicles during the course of the efforts made to extricate Eubanks, including the use of the metal lever in prying open the Volkswagen door.
The Volkswagen did not overturn; this was not a head-on collision, the damage to the Volkswagen having been concentrated upon its left upper front portion.
The photographs also reveal that the blow upon the perpendicular sheet metal side of the van-type trailer, though severe, was a glancing one. It would require a rejection of the laws of physics to suppose that the light Volkswagen, upon striking the van, did not carom off to its right. If the Volkswagen struck the van while the latter was in the correct or north lane, as testified by Thomas, the most surprising aspect of the matter is that it went no further toward the south than the eleven or twelve feet which took it to the point where it came to rest, still partly on the pavement. It is most improbable that it would have remained on the road at all, if the collision had occurred in the south lane, as suggested by appellees.
The construction of the van itself, with its perpendicular flat metal sides, had the effect of presenting a solid wall which would prevent flying glass or other debris from being projected into the north lane. It is a logical assumption that glass, chrome, and paint fragments, dislodged upon impact, likewise, would have caromed off the van wall toward the south lane. The tiny bits of paint scrapings, picked up at 7:30 a. m. or 8:00 a. m. by the patrolman, near the Volkswagen in the entrance to the gravel “turn off” road, on this wet and muddy day, may as reasonably be supposed to have been carried there by the tires of the ambulance in using this road to turn around, or by some of the many other vehicles, or even on the shoes of some of the people who, according to the undisputed testimony, were milling around the scene of the accident before the patrolman arrived.
Unfortunately, because of the time lapse, weather conditions, and events intervening before his arrival, the patrolman himself could only conjecture how these fragments came to be where they were when he picked them up. The fact that he found them there, under the circumstances in the record, is wholly insufficient to warrant an inference that negligence on the part of Thomas proximately caused or contributed to the injury and death of Eubanks.
Likewise, under the circumstances of this case, the failure of the patrolman to find skid marks is without significance, in the complete absence of further evidence, in establishing negligence on the part of Thomas.
The blacktop pavement was wet. It had been raining all night, and it was still raining. The Volkswagen is a light vehicle, and, the leaving of skid marks following a collision, under such conditions, is not an inevitable or infallible result. It is beyond all question that this light vehicle, upon striking the heavy van-type trailer, must have rebounded somewhere. A surprising feature of the case is that it did not go completely off the highway. The photographs do not indicate damage to the tires or wheels of the Volkswagen. It is impossible to know in what direction its front wheels were turned at the moment of impact, and, apparently, from the violence of the collision, as reflected by the damage to the Volkswagen, its brakes had not been effectively applied. Under these circumstances, it could not be said logically, from anything appearing in the record, *430 that the Volkswagen would not have rolled, rather than skidded, to the position where it finally came to rest, and thus have left no skid marks. It might as reasonably he speculated that Eubanks, in the fog and rain of this dark night, on a wet blacktop pavement, momentarily lost control of his small car and hit the side of the trailer. However, an attempt to postulate any particular theory as to the cause of the collision (at variance with the version given by Thomas) is impossible and such theorizing can rest only upon speculation and conjecture.
Moreover, it cannot be said that the circumstantial evidence is less consistent with the direct testimony of Thomas, the driver of the tractor-trailer, than it is with the theory of appellees that the tractor-trailer was in the south lane where it was struck. His version of the accident is supported, as far as her opportunity for observation went, by the testimony of Mrs. Fuquay as to the situation as she saw it immediately following the impact.
In Blizzard v. Fitzsimmons, 193 Miss. 484, 10 So.2d 343 (1942), it was held that where it cannot be determined which of several possible causes produced an injury and some of these causes do not involve negligence on the part of the party charged, recovery cannot be had. The Court said that a judgment cannot be sustained where it rests upon conjecture and surmise.
In 38 Am.Jur., Negligence section 334 at 1033-34 (1941), it is stated:
“ * * * In view of the fact that the burden of proof is on the plaintiff, such circumstances (relied upon for recovery) must be ample and must appear from the evidence. Moreover, the evidence must not leave the causal connection a matter of conjecture; it must be something more than consistent with plaintiff’s theory as to how the accident occurred. Where the proof of causal connection is equally balanced, or the facts are as consistent with one theory as with another, plaintiff has not met the burden the law casts upon him.”
In Denman v. Denman, 242 Miss. 59, 134 So.2d 457 (1961), the Court quoted, with approval, 10 Blashfield, Automobile Law and Practice section 6555 at 401 (1955), where it is stated:
“ * * * ‘It cannot be said, however, as a matter of law, where there is a collision of automobiles, that the accident did not happen as stated by either party solely from the respective positions of the automobiles after the accident; there being such a complexity of forces and resultants as to afford no idea where the two automobiles would go or what they would do.’ ” 242 Miss. at 66-67, 134 So.2d at 460.
Also, in Denman, supra, the Court approved the following statement appearing in 38 Am.Jur., Negligence, section 345 at 1045 (1941):
“ ‘ * * * if an accident appears upon the evidence to be as consistent with the absence of negligence for which the defendant is responsible as with the existence of such negligence, the plaintiff must fail, and the case should not be left to the jury.’ ” 242 Miss. at 67, 134 So.2d at 460.
The Court said further:
“Negligence may be established by circumstantial evidence in the absence of testimony by eyewitnesses provided the circumstances are such as to take the case out of the realm of conjecture and place it in the field of legitimate inference, and in such case the causal connection between the agency and the injury need not be shown by direct evidence.” (Citing numerous authorities.) 242 Miss. at 66, 134 So.2d at 459.
In Ryals v. Douglas, 205 Miss. 695, 39 So.2d 311 (1949) the Court said:
“ * * * The rule is that the testimony of a witness which is uncontradicted, *431 and who is not impeached in some manner known to the law, where he is not contradicted by the circumstances, must be accepted as true. It is true that the direct evidence of a witness may be contradicted by circumstances, but in such case the circumstances relied on for contradiction must be inconsistent with the truth of the testimony. * * * ” 205 Miss. at 722, 39 So.2d at 317.
In 8 Am.Jur.2d., Automobiles and Highway Traffic, section 958 at 504 (1963), it is said:
“The general rule is that testimony as to tire and skid marks on the highway is admissible in civil actions for injury or damage resulting from a motor vehicle accident where a sufficient foundation therefor is laid, as by showing, for example, that the condition of the highway was the same at the time of observation as it was at the time of the accident and that the marks had not been changed by the weather or traffic, and where there is sufficient identification of the marks as having been made by the motor vehicle involved in the accident.”
It is further said:
“ * * * In the absence of a showing that conditions remained unchanged after the accident, evidence as to skid marks observed a number of hours later is inadmissible and without probative value.” Id. at 506.
This same rule applies with equal force to evidence relied upon by appellees in the present case as to finding glass, paint scrapings and pieces of chrome. The basic premise, from which appellees draw their conclusion that the tractor-trailer was in the south lane at the time of the collision, requires an assumption that (1) the items of debris were dislodged by the impact and not in the course of extricating Eubanks from the wrecked Volkswagen and (2) the position of these items had not been disturbed and remained unchanged following the collision and until the arrival of the patrolman. Viewing the evidence most favorably to appellees, there is a complete absence of proof of that premise. In fact, all of the evidence, as to the weather conditions generally, traffic and intervening activities, tends toward an opposite conclusion.
In Berry v. Brunt, 252 Miss. 194, 203, 172 So.2d 398, 402 (1965), this Court said:
“The Court has repeatedly held that in trials under the common law, to prove a ‘possibility’ only, or to leave the issue to surmise and conjecture, is never sufficient to sustain a verdict in a tort action. A mere scintilla of evidence of negligence is insufficient to make a jury issue. The scintilla rule of evidence is not recognized in this State.”
The testimony of Mid Thomas, the only surviving eyewitness, was not inherently improbable, incredible, or unreasonable. Nor can it be said to be inconsistent with circumstances actually established by the evidence. No effort was made to impeach or discredit him and, his testimony may not be disregarded or rejected. Fisher v. Daniels, 252 Miss. 662, 173 So.2d 908 (1965).
A motion was made by the defendants at the trial for directed verdicts in their favor, both at the conclusion of the plaintiffs’ case and after all of the evidence was in for both sides. The motion for a directed verdict, made when the evidence for both sides was in, should have been sustained by the trial court.
There is an apparent difference of opinion between Aero Mayflower and the ap-pellees (Eubanks) as to whether the appeal by the latter from the dismissal of the case as to the former, is a direct or cross-appeal. We are constrained to view it as an attempt at direct appeal and there appears to be merit in Aero Mayflower’s motion to docket and dismiss for failure to perfect the appeal as required by law, either as a direct or cross-appeal.
*432 However, the appeal, whether direct or cross, appears to be without merit. Thomas was neither the employee nor agent of Aero Mayflower, nor about its business. He was an employee of McConnell Brothers and exclusively about their business. The action of the circuit court, in dismissing as to Aero Mayflower, was correct, and should be affirmed. Nor do we find any merit in the cross-appeal against McConnell Brothers.
The case is, therefore, reversed on direct appeal and judgment entered here for appellants, James E. McConnell, Jr., James W. McConnell d/b/a McConnell Brothers Transfer & Storage, and Mid Thomas, Jr.; affirmed on the cross-appeal by appellees as to the named appellants, and affirmed upon appeal by appellees (Eubanks) as to Aero Mayflower.
Reversed on direct appeal and judgment here for appellants, James E. McConnell Jr., James W. McConnell d/b/a McConnell Brothers Transfer & Storage, and Mid Thomas, Jr.; affirmed on cross-appeal as to the named appellants; and affirmed on appeal by appellees (Eubanks) as to Aero Mayflower Transit Company.
ETHRIDGE, C. J., and JONES, BRADY and PATTERSON, JJ., concur.