PATTERSON, Justice:
This appeal arises from a judgment of the Circuit Court of Montgomery County in the sum of $75,000 against Wardell Gunn for the wrongful death of James Robert Grice, the 14-year-old son of Mr. and Mrs. Homer C. Grice. The parents and two sisters of the decedent were plaintiffs below. The defendant prosecutes this appeal.
Young Grice was killed in the late afternoon of August 9, 1962, when the motor scooter on which he was a guest passenger collided with the truck being driven by appellant. The accident occurred on Win-gate Road, a blacktop road, in Kilmichael, Mississippi. This road runs east and west at the point of collision and bears rather *179 sharply to the north a few feet east of the site of the accident.
The defendant, at the time of the accident, was driving a pickup truck belonging to his employer in an easterly direction on Wingate Road. Plaintiffs’ decedent and the driver of the motor scooter, Charles Kent, Jr., were riding in a westerly direction at the time of the collision. The point of impact and the traffic lanes occupied by the two vehicles are in dispute.
The first assignment of error is that the •trial court erred in not directing a verdict for the defendant on motion therefor at the conclusion of the plaintiffs’ case for the reason that plaintiffs failed to offer any substantial or credible evidence that defendant’s negligence, if any, proximately caused or contributed to the death of plaintiffs’ decedent.
We are of the opinion this assignment is without merit. The plaintiffs’ evidence and all reasonable inferences arising therefrom are to be taken as true in determining the issue of whether the plaintiffs’ evidence has made a question for the jury. See Moseley v. Bailey, 193 So.2d 729 (Miss.1967) and Shaw v. Phillips, 193 So.2d 717 (Miss.1967), and other cases to the same effect too numerous to cite.
Mr. Grice, father of decedent, testified that he arrived at the scene of the accident prior to the removal of the truck. He observed that the truck was faced in an easterly direction with the right front wheel • in the ditch on the south edge of the road, the left front wheel on the edge of the pavement, the right rear wheel on the shoulder of the road, and the left rear wheel on the edge of the pavement. He testified that skid marks were clearly visible to the rear of the truck and described them in this manner:
The skid marks, as I said, the way I saw it, started from two or three feet over on the boys’ side of the road and went thirty some feet up the road before he could stop, and they was down there just plain, you didn’t have to have a rule or nothing to measure it with, it was just as plain as if you was looking at your hand.
He further testified that on Sunday following the accident on Thursday he, in company with Charles Henry Kent and Jimmy Kent, father and relative of the driver of the motor scooter, went to see the defendant in an effort to determine how the boys were killed, and was told by the defendant that the accident happened in this manner:
He says, “Mr. Homer, I didn’t see them until I hit them,” and says, “I looked around and seen the boys going in the air.” If ever I told the truth, gentlemen, God in heaven knows that’s the truth. He says, “I applied the brakes as quick as I could and I slid up there,” which was some thirty feet up the road.
Further, the witness stated regarding his conversation with Gunn:
Yes, sir, he told me that he just glanced off the road, looking, and that he hit something and he looked around and the boys was going in the air. Now if ever I told the truth, that’s it.
Grice also testified that on this same Sunday he again went to the scene of the accident where he saw some red clay dirt on the north side of the road approximately 11 feet west of where the skid marks began, similar to the 'dirt underneath the fenders of the scooter.
The next witness, Charles Henry Kent, father of the driver of the scooter, testified that the truck was in the ditch on the south side of the road as he observed it about dusk on the evening of the accident. In *180 response to a question in regard to the skid marks of the truck, the witness replied:
Those marks began under the left front wheel on the pavement, of the truck, and went to the rear of the truck and on to the west end of the road to where the skid marks stopped out there in the western part of the- road on the north side of the road where the skid marks had first begun.
The following morning he returned to the scene and on this occasion, according to his testimony, observed some red clay dirt west of the position of the truck as it was located the preceding afternoon. This dirt, he testified, was located 6 feet 3 inches south of the north edge of Win-gate Road and 11 feet west of the skid marks put down by the defendant’s truck, and was similar to dirt under the fenders of the scooter. He also found two small pieces of metal just off of the north edge of the pavement and &1/2 feet east of the red clay dirt. His testimony in regard thereto was that these pieces of metal were part of a coupling from underneath the fender of the scooter. He stated that on this occasion he made and recorded measurements of his observations from which he made a sketch of the scene. He used this drawing to refresh his memory while testifying. The sketch was offered in evidence, but on objection that it had self-serving conclusions in it, it was not admitted. The witness testified further that many people came to the scene of the accident though he observed no vehicular traffic pass the wreckage.
The following year, June 1963, this witness accompanied an’ engineer to the scene of the accident, pointed out the general area and gave him the sketch he had formerly made so that a map of the area could be prepared. This witness also testified to the statements alleged to have been made by the defendant on the occasion of the conversation referred to by Grice, to determine the cause of the boys’ death. Kent’s version of the conversation was:
* * * he stated that he was driving down the road there and all of a sudden— he barely remember exactly what happened there, he said he didn’t hardly see them, but he knew that there was a bump and as he felt the bump and saw the little boys he hit his brakes and turned to the ditch, skidded on off in the ditch * * *
Pat Jamison, the engineer mentioned, was next called as a witness. He testified that he prepared a map of Wingate Road at the location where it was said that a collision occurred between a truck driven by the defendant and a motor scooter operated by Charles Kent, Jr. He related that the map was made at the request of the plaintiffs; that it was prepared from his own field notes and measurements — that is, the general scene, the roadway, the trees, the ditch, etc. — but that the information set forth as to the accident, portrayed by an inset on the map, was taken from a sketch given to him by Kent. This inset depicts a focal point designated as “red clay” from which arrows with the distances thereon radiate to various objects or substances to the east designated as “8'6", broken metal, ll'O", left tire skid marks; 9/0", right tire skid mark.” East of the beginning of the left tire skid mark there is an area designated “3'9", blood and hair;” and 19'6" southeast from “broken metal” there is an area designated “gashes in pavement,” 15'0" east of which is a point designated “oil.” From this latter point, northeasterly 14'0", a point was designated “blood” and 7'2" farther east another point was so designated. The court allowed the map to be introduced into evidence, over objection, under the following circumstances:
The Court is of the opinion that the instrument or map is admissible provided there is deleted therefrom the words, “from scooter” after the word “or” and *181 any reference to location of bodies. As the Court sees the map, it appears that all the other things shown here were properly identified and testified to by the preceding witness, and the Court is of the opinion that the map should be admitted into evidence with the deletions mentioned.
The deletions were attempted to be made by striking over the words “from scooter” and “first body” and “second body.” Though intended to be deleted, the quoted words distinctly appear through the marks made to delete them. (Further reference to the map is hereinafter made under the third assignment of error.)
John Clinton Yates, the next witness for the plaintiffs, testified that he arrived at the scene no later than 45 minutes after the accident and that he observed skid marks to the rear of the truck which appeared to be 30 or 35 feet in length and that they started, in his estimation, about two feet on the north side of the road. He also noticed some dirt on the north side of the road about 10 or 12 feet west of the skid marks.
On cross-examination he answered in the affirmative to a question as to whether the area was “red clay country,” and he could not swear where the dirt on the road came from.
The next two witnesses for the plaintiffs, Alvin Malone, who observed the scene two days after 'the accident, and G. C. O’B riant, who observed the scene the day following the accident, corroborated the other witness somewhat. Malone testified that he observed four skid marks, all of which started in the north portion of the road and skidded across into the ditch. O’Briant testified that he was able to discern skid marks which began four or five feet over the center of the road in the westbound traffic lane and which were some 30 or 35 feet in length. He stated in response to a leading question that he saw mud or dirt and debris four or five feet west of where the skid marks began. On cross-examination, with further reference to the dirt, he testified that he did not remember whether or not the dirt was “red clay” and that he could not say where it came from.
Sidney Allen, the next witness for the plaintiffs, testified that he arrived on the scene within five or ten minutes after the accident and that he saw the bodies of the boys on the roadway. The body of the Grice boy was lying partially on the pavement on the north side of the road. The body of Kent was lying on the pavement to the front of the truck. He further stated that he saw some dirt or debris immediately behind the truck and that there was a skid mark about three feet long extending from the left rear wheel of the truck to approximately the middle of the road.
The defendant, Wardell Gunn, a Negro man, was called as an adverse witness by the plaintiffs. He testified that he was proceeding in an easterly direction at a reasonable rate of speed at the time of the accident. He testified further that as he approached the curve in the road he observed two boys on a motor scooter coming around the curve in a westerly direction at a rapid rate of speed; that he pulled nearly off the pavement to the right and stopped, and that the scooter struck the truck. To be precise we use his words as to the event:
I had my foot laying on the brake and I just crossed the curve, you could just look through two trees. Well, they was coming so fast, that little old scooter was, until I just pulled over there and stopped, and the minute I stopped (striking hands together) just like that.
* * * * * *
Yes, sir, they slid a little, but I was already stopped before they got to me. *182 The minute I stopped, that is when they come into me because they was leaning over, I don’t think they was even looking themselves.
The witness acknowledged that the fathers of the deceased boys came to see him following the accident and questioned him. He denied, however, making any statements to them as to the accident, saying rather that he advised them they would have to talk with a Mr. Ballard (apparently his foreman or supervisor).
Considering the evidence most favorable to the plaintiffs as true, as under our authorities we must, and the reasonable inferences to be drawn therefrom, we are of the opinion that the plaintiffs’ evidence, the admissions of the defendant, the skid marks to the north of the center of the road, and the surrounding circumstances, were sufficient to make a question of fact for the jury.
As heretofore stated, we are of the opinion this assignment of error is without merit.
The second assignment of error is that the court erred in refusing to grant the peremptory instruction requested by the defendant at the conclusion of all the testimony for the reason set out in its first assignment of error and for the further reason that the defendant showed through the only probative evidence offered that he was free from negligence proximately causing or contributing to the death of plaintiffs’ decedent. In passing upon this question it is necessary that the evidence offered by the defendant be detailed somewhat so that it might be considered in conjunction with the foregoing testimony of the plaintiffs.
The town marshal was the first witness for the defendant. He testified that he arrived at the scene of the accident shortly after it occurred and inquired as to whether the sheriff had been called, and that, upon this query being answered in the affirmative, he stayed at the scene and directed traffic since it was “sort of jammed up out there.” He testified that some of this traffic went by the scene of the accident. Photographs were introduced by him showing the scooter and parts therefrom lying in the roadway to the front of the left portion of the truck. He testified further that he examined the area to the rear of the truck and found no dirt or parts of the motor scooter west of the left front wheel of the truck. With further reference to the traffic at the scene, he testified that a truck had stalled to the rear of that involved in the accident, as follows:
A. It was back of this pickup, it had the traffic stopped, and they got out there to move it and got it cranked or something, I don’t remember just what, but they got it out of'the way.
Q. That was after you got down to the scene ?
A. That was after I got there, yes, sir.
Q. And while you were directing .traffic?
A. Yes, sir.
Q. That would be to the west of where the truck was sitting?
A. That’s right.
Q. Where the Gunn truck was sitting?
A. That’s right.
With reference to the skid marks in the center of the road, he asserted that the skid mark of the left wheel started just to the right of the center of the road, that *183 is, in the truck’s lane of traffic. On cross-examination the record reveals:
Q. Mr. Moore, would you tell the jury that there absolutely was not any dirt to the west of the beginning of the skid marks in the road?
A. I would say there wasn’t when I was there.

Q. You could have missed seeing it?
A. Well, there is a possibility, but I looked pretty close.
Earl Patridge, the Sheriff of Montgomery County at the time of the accident, testified that he arrived on the scene about dark and that he saw the truck partially in the road, and the motor scooter, as well as a large crowd of people. He testified that he made photographs of the scene, but that they were defaced somewhat by the beams from a street light; that the next day he returned and made other pictures of the scene which depicted the roadway and skid marks which began on the defendant’s side of the road, that is, within the eastbound traffic lane. He related further that he interrogated two eye witnesses to the accident, a Mr. and Mrs. George Hudson, but testified that both of these witnesses are now deceased.
The testimony of Pleas Bond was that he arrived at the scene of the accident after the boys had been removed, but that it was still daylight and that the truck was on the south side of the road headed in an easterly direction with its right front wheel in the “grader” ditch. He testified further that the scooter was lying three or four feet in front of the pickup and that there were other articles, some wrenches and a little handbag, in front of the pickup.
The next witness was Mr. A. C. Green-lee, the first person to arrive at the scene of the accident. He testified to the location of the truck on the south side of the road and that the scooter was lying in front of the truck near the center of the road. In response to a question concerning the skid marks, he stated that they extended from the back tire of the truck a distance of approximately eight feet and that they were on the truck’s side of the road. In reply to the question, “Now did you see any type of skid mark in front of the truck?” the witness answered:
I saw the scooter, where the scooter came up and hit the truck. Well, it was a light skid mark right under the bumper; that was the scooter, where it came back, you see;, it hit and sort of run under that bumper a little bit and then came back and left a little mark. Now there was tracks, you could see the track that came up there immediately in front of the bumper from the scooter, but I didn’t notice any skid on the scooter except where it started back.
He also testified that he found one of the boys lying immediately in front of the truck close to the center of the road and the other over on the opposite (north) edge of the road. He testified additionally that parts of the scooter and debris from the collision were in front of the truck and that no parts or debris were behind it though he did observe three or four feet of skid marks directly behind the rear tire. The statement relating to the debris and parts of the motor scooter was contradicted on cross-examination by the introduction of a written statement taken from the witness prior to the trial wherein he professed:
I didn’t remember seeing any debris or mud in the road or blood or hair from the boys, nor do I remember the condition of the scooter or any parts of same in the road.
He did, however, aver that the picture introduced as Exhibit 2 to the testimony of *184 Mr. Moore correctly represented the scene as he saw it on the date of the accident, which picture shows the articles — tools, handbag, scooter and debris' — to be in front of the truck.
The final witness for the defendant, Charles Sharp, testified that he was one of the first to arrive at the scene. He stated that the defendant’s truck was on the south side of the road; that the motor scooter was lying from three to five feet in front of the left front fender of the truck; that the boys were lying a little behind the motor scooter toward the middle of the road. He testified that there were skid marks about the length of the truck to the rear thereof and that these skid marks were altogether on the south side of the road, that is, in the eastbound traffic lane. He testified further that the debris and parts of the motor scooter resulting from the impact of the two vehicles were scattered in front of the truck over the road. His testimony in regard to the skid marks of the motor scooter was as follows:
Q. Would you describe the marks you observed there?
A. Well, you could see where the motor scooter came around in that curve, where it sort of slid a little towards the south side of the road before it hit the truck, and you could tell when it hit the truck where it slid back just a little bit.
Q. Now were these tire marks on the pavement ?
A. Yes, sir.
Q. You could see these tire marks?
A. Yes, sir.
Q. Did they match up with the scooter itself ?
A. Yes, sir, they were definitely scooter marks.
Q. About how far back would you say that these marks were made? About how far back did you observe them?
A. I’ll say about eight feet or something like that, approximately.
Q. Now the tire marks of the scooter, where did they lead to?
A. To the left front part of the pickup.
Q. To the left front part of the pickup ?
A. Yes, sir.
Q. And was that at the very point or the very position that the pickup was sitting there in the ditch ?
A. Yes, sir.
We have given careful consideration to the entirety of the competent evidence and after deliberation it is our opinion, with the exception of Justice Rodgers, who has a divergent view, that the verdict of the jury is against the overwhelming weight of the evidence. In arriving at this conclusion we are influenced to a great extent by the undisputed testimony of the witnesses as well as the photographs, which so clearly set forth the scooter, the handbag and other debris resulting from the impact, within a few feet of the front of the truck. The red clay and small metal objects to the west of the rear of the truck are not considered in arriving at this conclusion for the reason they were found at a time remote to the accident, after many people had been to the scene, and after vehicular traffic had passed the immediate area. In fact, there is no testimony that the scene of the accident was the same when these objects were discovered the next morning as it was on the afternoon of its occurrence. The witness who came across the “red clay” and the “metal objects” was not able to say, and made no attempt to say, that any of the things he *185 observed at the scene were in the same condition or were situated as they were immediately following the accident. It would be mere speculation under the undisputed circumstances of this case to say that they had come to rest following the impact where found by the witness, particularly since other vehicles and numerous pedestrians had traversed the area. McConnell v. Eubanks, 193 So.2d 425 (Miss.1966).
Plaintiffs’ theory of the case, that the impact occurred at the site of the red clay in the westbound lane of traffic north of the center of the road, and that the boys’ bodies, motor scooter, tools, handbag, cookies and debris were deposited 55 feet east of the theoretical point of impact, with no articles or debris between the two points, is completely overwhelmed, in our opinion, by viewing the photographs taken at the scene and the testimony of the witness who arrived immediately after the accident and before the scene was subject to distortion by curious onlookers. The photograph of the front of the truck shows only a slight indentation on the bumper and some blue paint from the motor scooter. The numerous photographs of the motor scooter itself do not lend themselves to the inference that the impact was sufficient for the bodies, motor scooter, and debris to be deposited a distance of 55 feet from the point of contact. In fact, the truck is red, the motor scooter is blue, and there is only one slightly blue mark on the bumper of the truck indicating contact, and this, in our opinion, with the other evidence, completely negates the theory of the plaintiffs. The plaintiffs’ theory at best admits of only a possibility, but it is highly improbable, and the mere possibility of the happening of an event has been held by this Court to be insufficient to sustain a verdict. In McConnell v. Eubanks, 193 So.2d 425, 431 (Miss.1966), we stated, in quoting from Berry v. Brunt, 252 Miss. 194, 203, 172 So.2d 398, 402 (1965), the following :
The Court has repeatedly held that in trials under the common law, to prove a “possibility” only, or to leave the issue to surmise and conjecture, is never sufficient to sustain a verdict in a tort action. A mere scintilla of evidence of negligence is insufficient to make a jury issue. The scintilla rule of evidence is not recognized in this State.
We are aware of the delicate line of distinction between the court’s overruling a motion for a peremptory instruction at the conclusion of the plaintiffs’ evidence and sustaining a motion for a new trial on the ground that the verdict was against the weight of the evidence, the former being decided upon the sufficiency or insufficiency of the plaintiffs’ testimony within itself and the latter being decided upon the testimony of both the plaintiff and the defendant. In the event a peremptory instruction for the defendant is granted on the plaintiffs’ testimony only, the plaintiff is not entitled to a new trial. On the other hand, if a verdict of a jury is found to be against the overwhelming preponderance of the evidence, the plaintiff is entitled to, and the trial judge may grant, two new trials (Mississippi Code 1942 Annotated section 1536 (1956)), but if upon the third trial the jury still persists in its view of the evidence, then the judge must not further interfere. The distinction is aptly stated in Mobile & O. RR v. Johnson, 165 Miss. 397, 403, 141 So. 581, 582 (1932) as follows:
The rule is that, laying aside and leaving out of view the testimony in behalf of defendant, if the evidence in behalf of the plaintiff is sufficient in law to establish the legal right of the plaintiff in issue and is not inconsistent with the admitted physical facts or with natural laws or common knowledge, and, so viewed, the plaintiff’s testimony taken alone is such that reasonable men, acting reasonably, could reasonably believe that *186 testimony and prudently act upon it, then a peremptory instruction for the defendant must not be given. When, however, all the testimony has been heard and all the arguments delivered and the verdict returned, if, upon a completed view of the entire case, the trial judge is then of the opinion that the verdict is against the overwhelming weight, or clearly against the great preponderance, of the evidence, his duty is, upon a motion for a new trial, to set aside the verdict and grant a new trial.
Of interest, Sanders, When May a Court Direct a Verdict in Mississippi, 12 Miss. L.J. 86 (1940). It is our opinion, therefore, that the second assignment of error is well taken and will require the cause to be remanded for a new trial.
The third assignment of error, the basis of which will in all probability arise again on new trial, is that the court erred in admitting in evidence the map of Pat Jami-son for the reason that it was prepared by one not having knowledge of its significant contents and depicted in writing plaintiffs’ version of the accident which occurred out of the presence of the author of the exhibit, to the substantial prejudice of the defendant. We agree for the reason that there is no evidence that the “red clay,” the focal point of the inset to the map, was part of the debris that resulted from the impact. The discovery of the clay was remote in time from the accident; it was found only after many people and vehicles had traversed the area. This type of evidence was condemned in McConnell v. Eubanks, 193 So.2d 425 (Miss.1966):
It may be said to be reasonable to infer that the bits of glass, chrome and paint scrapings came from the wrecked Volkswagen. But it is speculation, under the undisputed circumstances of this case, to say that they had come to rest following the impact where found by the patrolman, particularly since the ambulance and numerous other vehicles and pedestrians had traversed the area. (193 So.2d at 429)
“In the absence of a showing that conditions remained unchanged after the accident, evidence as to skid marks observed a number of hours later is inadmissible and without probative value.” (193 So.2d at 431)
We are of the opinion the court erred in admitting the inset to the map into evidence. Its admission, in effect, allowed plaintiffs’ theory of the case, depicted by drawing and writing, to be carried into the jury room for consideration. In Hatcher v. Quincy Horse Ry. Co. 181 Ill.App. 30 (1913), the court said:
* * * The plat has many measurements marked upon it with various lines showing the levels or lines of vision from the curb, sidewalk, grade of the buildings and from certain elevations above the sidewalk to a person of the height of appellee standing on the further step, or platform of the car through the window, with written memoranda of the heights and distances in feet and inches and gives a full explanation of the various lines and figures and what the various levels and lines of vision are. These were all matters that are readily understood from the oral testimony of witnesses. The plat as offered was an endeavor to get before the jury the written testimony of the author of the plat that it might take such written evidence to the jury room, and is in the nature of a written argument upon the oral testimony. While a general plat would be proper (Justen v. Schaaf, 175 Ill. 45, 51 N.E. 695, Wahl v. Laubersheimer, 174 Ill. 338, 51 N.E. 860), the court properly sustained the objection because of the written memoranda, levels and lines of vision thereon.
The undue emphasis given to the “red clay” (itself inadmissible in evidence), as the focal point of other objects depicted in support of plaintiffs’ theory of the case, could only redound to the prejudice of the *187 defendant. See Carruth v. Griffis, 220 Miss. 541, 544-545, 71 So.2d 478, 479 (1954) wherein we stated:
It was error to admit officer Erring-ton’s map. He testified that he observed no tracks or marks of the Kaiser on the pavement when he made his examination shortly after the wreck. Yet, he prepared the map and indicated the course whereby the Kaiser was shown to have turned the curve on the wrong side of the road and was still partly on the wrong side at the time of the collision. Hence, although he was not present when the wreck occurred, by the map he was testifying that the Kaiser was driving on the wrong side of the road as it turned the curve and approached the point at which the collision of the two automobiles occurred.
Compare the case of Boyd v. Donald, 250 Miss. 618, 624, 167 So.2d 661, 663 (1964) holding a similar police report admissible for the purpose of impeachment, but distinguishing Carruth v. Griffis, supra, as a case in which:
[A]n officer’s map based on what others told him was not admissible on examination of the officer in chief.
We conclude, therefore, that the introduction of the inset to the general map constituted reversible error, though we do not say that the general map itself was inadmissible.
Reversed and remanded.
ETHRIDGE, C. J., and RODGERS, SMITH, and ROBERTSON, JJ., concur.